STATE OF RHODE ISLAND ⚓ AND PROVIDENCE PLANTATIONS

## SUPERIOR COURT

__X__ *Providence County*
Licht Judicial Complex
250 Benefit Street
Providence, Rhode Island 02903

____ *Kent County*
Kent County Judicial Complex
222 Quaker Lane
Warwick, Rhode Island 02886

____ *Newport County*
Murray Judicial Complex
45 Washington Square
Newport, Rhode Island 02840

____ *Washington County*
McGrath Judicial Complex
4800 Tower Hill Road
Wakefield, Rhode Island 02879

CIVIL ACTION, FILE No. PB 12-1258

MARK GOLDSTEIN ......................................
**Plaintiff**

DASSAULT SYSTEMES SIMULIA CORP. .............
**Defendant**

*Summons*

*To the above-named Defendant:*

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon ....**Robert D. Fine, Esq. (#2447)**.............. Plaintiff's attorney, whose address is ...**Chace Ruttenberg & Freedman, LLP, One Park Row,**................. **Suite 300, Providence, RI 02903**............................................................................................. an answer to the complaint which is herewith served upon you within 20 days after service of this summons upon you, exclusive of the day of service.

If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint. Your answer must also be filed with the court.

As provided in Rule 13(a) unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

*A TRUE COPY ATTEST*
*SERVED 3/9/12*
*Paul C. Hughes*
*Paul C. Constable #40*
*R.I.*

...................................................,
**CLERK**

Dated: ...**March 8, 2012**.............................

**(Seal of the Superior Court)**

**S-135** (REV. 02/07)

# BUSINESS CALENDAR CASE OPENING SHEET

**STATE OF RHODE ISLAND**
**SUPERIOR COURT**

Case # PC-12-1258

| PLAINTIFF: | DEFENDANT: |
|---|---|
| MARK GOLDSTEIN | DASSAULT SYSTEMES SIMULIA CORP. |

| PLAINTIFF'S COUNSEL: | DEFENDANT'S COUNSEL: |
|---|---|
| (If more than one supply information for each) | (If more than one supply information for each) |
| Name: Robert D. Fine, Esq. | Name: |
| Address: 1 Park Row, Ste. 300., Prov., RI | Address: |
| Telephone No. (401) 453-6400 | Telephone No. |
| Name: | Name: |
| Address: | Address: |
| Telephone No. | Telephone No |

**NATURE OF PROCEEDING** -- Check the applicable case type under main categories listed below (check only one)

☒ Breach of contract or fiduciary duties, fraud, misrepresentation, business tort or statutory violations arising out of business dealings and/or transactions.

☐ Transactions governed by the provisions of the Uniform Commercial code.

☐ Complicated transactions involving commercial real property.

☐ Shareholder derivative actions.

☐ Commercial class actions.

☐ Commercial bank transactions.

☐ Matters affecting the internal affairs or governance of business organizations or entities.

☐ Business insolvencies and receiverships.

☒ Other (generally describe nature) Breach of contract and declaratory judgment re: non-competition provision of employment agreement.

| | | |
|---|---|---|
| Have there been efforts at mediation? | Yes____ | No X |
| Have there been efforts at arbitration? | Yes____ | No X |
| Other dispute resolution mechanisms? | Yes____ | No X |

Is this a case that may require a trial for resolution? ☒ Yes ☐ No If yes: ☐ Jury or ☒ Non-jury

If this is a case that was filed prior to June 4, 2001, what is the present status?
☐ Motion to Dismiss ☐ Summary Judgment ☐ Discovery ☐ Awaiting assignment for trial

**The undersigned requests assignment to the Business calendar --** _Robert D. Fine_

DATE: 3/9/2012

Attorney for **plaintiff/defendant** (strike one)
Attorney ID# 2447

The above case may be placed on the Business Calendar _____

Associate Justice

STATE OF RHODE ISLAND                                    SUPERIOR COURT
PROVIDENCE, SC.

MARK GOLDSTEIN                          :
                                        :
        -V-                             :          C.A. No. PB 12-1258
                                        :
DASSAULT SYSTEMES                       :
SIMULIA CORP.                           :

### COMPLAINT FOR DECLARATORY RELIEF
### AND DAMAGES FOR BREACH OF CONTRACT

1.      Plaintiff Mark Goldstein is a resident of the Commonwealth of Massachusetts and was
        employed in the State of Rhode Island by Defendant Dassault Systemes Simulia Corp.
        ("DSSC") pursuant to written employment agreements until February 29, 2012.

2.      Defendant DSSC is and at all times mentioned was a corporation organized and existing
        under the laws of the State of Rhode Island and has its office and principal place of
        business at 166 Valley Street Providence, Rhode Island. DSSC is a subsidiary of Dassault
        Systems S.A., ("Dassault Systemes") a worldwide corporation which is headquartered in
        France.

3.      On May 15, 2009, Plaintiff and DSSC entered into an employment agreement, a copy of
        which is attached hereto as Exhibit A ("Employment Agreement"). Plaintiff signed and
        returned the document which had been prepared by Defendant and signed by the
        Chairman of the Board of Directors of DSSC prior to Plaintiff's signing of the
        Employment Agreement.

4.      The Employment Agreement was similar in certain respects to a previous employment
        agreement between the parties providing for employment by Plaintiff with Defendant
        dated May 16, 2005, attached hereto as Exhibit B.

5.      The Employment Agreement provides that DSSC employed Plaintiff in the position of
        Executive Vice President & Strategic Advisor, reporting to both the Chairman of DSSC,
        who is also President and CEO of Dassault Systemes and to the Executive Vice
        President, Strategy and Marketing, of Dassault Systemes, starting April 1, 2009.

6.      Plaintiff had reporting responsibilities and duties to Dassault Systemes, as of the effective
        date of the Employment Agreement and previously.

7.      The Employment Agreement provides at Section 11 that "This is a Rhode Island contract
        and shall be governed and construed in accordance with the laws of the State of Rhode

Island . . ."

8. Pursuant to Section 4 of the Employment Agreement, Plaintiff can terminate the Employment Agreement for "Good Reason," a defined term under the Employment Agreement and also a defined term under the previous employment agreement, Exhibit B, at Section 4.

9. Pursuant to the Employment Agreement, Plaintiff could terminate the Employment Agreement for "material diminution in the nature and scope of your duties or responsibilities to the Company or any of its Affiliates with respect to (A) your role as Executive Vice President and Strategic Advisor of the Company or (B) your reporting relationship to the Chairman of the Company and the Executive Vice President, Strategy and Marketing of Dassault Systemes."

10. Plaintiff's reporting responsibility to the Chairman of Company was removed by Defendant, eliminating Plaintiff's reporting relationship to the Chairman of DSSC and President and CEO of Dassault Systemes.

11. Plaintiff's reporting responsibility to the Executive Vice President, Strategy and Marketing of Dassault Systemes was exclusively dependent upon Plaintiff working on mergers and acquisitions. When Dassault Systemes stopped involving Plaintiff in any merger and acquisition work, as of approximately June, 2011, the Executive Vice President, Strategy and Marketing of Dassault Systemes ceased having any contact with Plaintiff, effectively ending any reporting relationship between Plaintiff and the Executive Vice President, Strategy and Marketing of Dassault Systemes.

12. Plaintiff's reporting responsibility was further diminished by removal of reporting responsibility to any member of Dassault Systemes' Executive Committee, which was communicated to Plaintiff on October 20, 2011.

13. Defendant materially diminished the nature and scope of Plaintiff's duties and responsibilities with Defendant and Affiliates; inter alia (a) Plaintiff was no longer invited to attend Dassault Systemes' Global Executive Management meetings and was the only Executive Vice President uninvited; (b) Plaintiff was the only Executive Vice President not invited to Dassault Systemes' 2012 Leaders Convention, being the only Executive Vice President not to be invited and despite having been invited in previous years to the Leaders Conventions; (c) Plaintiff was directed to report to lower-level employees of Dassault Systemes; (d) Plaintiff was removed from serving as Executive Sponsor over accounts which represented over one-half of Plaintiff's time; (e) Plaintiff was no longer assigned Merger and Acquisition projects, a job duty that had been a significant component of Plaintiff's duties and responsibilities and (e) has otherwise been frozen out of duties and responsibilities.

14. Defendant's marginalization of Plaintiff, removal of responsibilities and duties and removal of reporting responsibility to Defendant's Chairman and to the Executive Vice

–2–

President, Strategy and Marketing of Dassault Systemes, and to any other member of Dassault Systemes' Executive Committee all constitute Good Reason for Plaintiff to terminate his employment with Defendant.

15. Plaintiff terminated his employment with Defendant effective February 29, 2012, by letter dated January 17, 2012.

16. In the event of termination by Plaintiff of employment for Good Reason, Defendant is required to pay Severance Payments and Performance Bonus Payments pursuant to Section 5(a) of the Employment Agreement.

17. Defendant has not made Severance Payments or Performance Bonus Payments to Plaintiff under Section 5(a) of the Employment Agreement and Defendant has advised Plaintiff that Defendant will not be making such payments, in breach of contract.

18. Section 3(c) of the Employment Agreement contains certain non-competition provisions which are intended to only restrict competition and with no other valid purpose and therefore are void and unenforceable pursuant to Rhode Island law.

19. Plaintiff recognizes that restrictions on his use of confidential information and intellectual property of Defendant and Affiliates contained in Sections 3(a) and (b) of the Employment Agreement are appropriate and Plaintiff has abided by and will continue to abide by those provisions.

20. Defendant has asserted that Section 3(c) of the Employment Agreement (Non-Competition) is also enforceable despite Rhode Island law, which is incorporated into the Employment Agreement.

21. The non-competition provision in Section 3(c) of the Employment Agreement is harsh, inequitable, unfair and unenforceable and is further in contravention of the public policy of the State of Rhode Island. The non-competition provision is excessive as to time, eighteen months, scope, including work with simulation software applications, Product Lifestyle Management and 3D technology and as more fully described in Section 3(c) of the Employment Agreement and as to the area within which competition by Plaintiff with Defendant is attempted to be forbidden, worldwide, and is inapplicable where Defendant has, by its actions, constructively terminated Plaintiff's employment.

22. The non-competition provision between Plaintiff and Defendant is void and unenforceable and in contravention of the laws of the State of Rhode Island in that it is in restraint of trade and constitutes an attempt on the part of Defendant to interfere with Plaintiff's attempt to earn a livelihood. It is unnecessary to protect any valid interest of Defendant.

23. Pursuant to R.I. Gen. Law § 9-30-1, et seq., including § 9-30-3, Construction of Contracts, this Court may declare the rights, status and other legal relations between the

parties and specifically the enforceability of the non-competition provision contained in Exhibit A.

24.    There is a question of construction and enforceability of Section 3(c) of the Employment Agreement, prepared by Defendant and executed by the parties. Defendant contends that Plaintiff cannot engage in any type of business that could be considered competitive with Defendant, preventing Plaintiff from earning a livelihood in his chosen field.

25.    Under the law of the State of Rhode Island, this Court has jurisdiction to hear and determine the question of construction and enforceability of the non-competition provision contained in the Employment Agreement and to declare the rights of the parties. Plaintiff is without any other adequate remedy at law or in equity other than institution of a declaratory judgment suit.

26.    Plaintiff is entitled to declaratory relief that the non-competition provision contained in Section 3(c) of the Employment Agreement is unreasonable and unenforceable under the facts of this case.

27.    Plaintiff is also entitled to damages for DSSC's breach of Plaintiff's Employment Agreement, failure to pay Severance Payments and Performance Bonus Payments pursuant to Section 5 of the Employment Agreement upon termination of employment.

WHEREFORE, Plaintiff requests that:

1.    The Court take jurisdiction of the subject matter of this cause and of the parties;

2.    The Court enter a decree determining and adjudicating the rights of the parties as to the purported non-competition provision in the Employment Agreement and declaring that Section 3(c) of the Employment Agreement is unreasonable and unenforceable under the facts of this case;

3.    The Court award Plaintiff damages for breach of contract; and

4.    The Court grant such other relief as it deems just.

Mark Goldstein
By his attorneys,

Robert D. Fine, Esq. (#2447)
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903
Phone: (401) 453-6400
Fax:    (401) 453-6411

May 15, 2009

Mr. Mark Goldstein
1 Manning Way
Sharon, Massachusetts 02067

Dear Mr. Goldstein:

This letter will confirm changes to the terms and conditions of your employment that were agreed upon in response to your decision to return to work on a full-time basis with Dassault Systèmes Simulia Corp. Effective April 1, 2009 ("Effective Date"), your employment with Dassault Systèmes Simulia Corp. (the "Company") will continue under the terms and conditions that follow:

1. **Position and Duties.**

(a) As of the Effective Date, you will be employed by the Company hereunder on a full-time basis as EVP & Strategic Advisor of the Company, reporting to the Chairman of the Company and the Executive Vice President, Strategy & Marketing of Dassault Systèmes. In addition, you may be asked from time to time to serve as a director or officer of one or more of the Company's Affiliates, without further compensation.

(b) You agree to perform the duties of your position and such other duties as may reasonably be assigned to you from time to time. You also agree that, while employed by the Company, you will devote your full business time and your best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and its Affiliates and to the discharge of your duties and responsibilities for them; notwithstanding the foregoing, you may devote a reasonable amount of time to civic and charitable activities, provided such activities do not pose a conflict of interest or interfere with your performance of your duties and responsibilities to the Company and its Affiliates hereunder. As a condition of your employment, you will remain subject to the Dassault Systèmes Code of Business Conduct.

(c) The parties agree that your employment hereunder shall not be for a definite term, and that either you or the Company may terminate your employment at any time in accordance with Section 4 hereof.

2. **Compensation and Benefits.** During your employment, as compensation for all services performed by you for the Company and its Affiliates, the Company will provide you the following pay and benefits:

Exhibit A.

(a)     **Base Salary.** As of the Effective Date, the Company will pay you a base salary at the rate of Three Hundred and Forty Thousand Dollars ($340,000) per year, payable in accordance with the regular payroll practices of the Company and subject to annual review, with any increase to be in the discretion of Dassault Systèmes. Your base salary, as from time to time increased, is referred to hereafter as the "Base Salary." In no event will the Base Salary be decreased. Notwithstanding the foregoing, from January 1, 2009 to March 31, 2009, your Base Salary will be Two Hundred and Ten Thousand Dollars ($210,000) and will be calculated on a pro rata basis for that three month period.

·  (b)     **Performance Bonus Compensation.** You will be eligible annually for bonus compensation in accordance with the terms set forth by the Company each year for you (the "Performance Bonus"). As of the Effective Date, your gross target bonus opportunity (the "Target Performance Bonus") will be Sixty Thousand Dollars ($60,000), if the objectives are met, and the amount of the bonus payment (if any) will be determined in accordance with objectives set by the Company. Any bonus to which you become entitled will be paid in a single lump-sum cash payment as soon as practicable following the end of the calendar year in which the bonus is earned, but in no event later than the 15th day of the third month following the end of such calendar year.

(c)  ·  **Long-Term Incentive Compensation.** You will be eligible for Dassault Systèmes stock-options upon the formal approval of the Board of Directors of Dassault Systèmes and/or for any Long-Term Incentive (LTI) Compensation Plan for which you may be selected. Nothing contained herein shall affect any existing rights or obligations you may currently have under prior stock option grants or long term incentive plans.

·  (d)     **Participation in Employee Benefit Plans.** You will be entitled to participate in all employee benefit plans from time to time in effect for employees of the Company generally, except to the extent such plans are duplicative of benefits otherwise provided you under this Agreement (e.g., severance pay). Your participation will be subject to the terms of the applicable plan documents and generally applicable Company policies.

(e)     **Vacations.** You will be entitled to up to four (4) weeks of vacation per year, in addition to holidays observed by the Company. Vacation may be taken at such times and intervals as you shall determine, subject to the business needs of the Company.

(f)     **Business Expenses.** The Company will pay or reimburse you for all reasonable business expenses incurred or paid by you in the performance of your duties and responsibilities for the Company, subject to any maximum annual limit and other restrictions on such expenses set by the Company and to such reasonable substantiation and documentation as it may specify from time to time. All reimbursements of business expenses hereunder will be made no later than December 31 of the year following the year in which you incur the expense. In no event will the amount of the business expenses eligible for reimbursement in one calendar year affect the amount of expenses eligible for reimbursement in any other calendar year. Your right to reimbursement will not be subject to liquidation or exchange for another benefit.

3. **Confidentiality and Restricted Activities.**

(a) **Confidential Information.** You acknowledge that the Company and its Affiliates continually develop Confidential Information (as defined below); that you may develop Confidential Information for the Company or its Affiliates; and that you may learn of Confidential Information during the course of employment. You will comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and shall not disclose to any Person or use, directly or indirectly, for your own benefit or for the benefit of others, other than as required by applicable law or for the proper performance of your duties and responsibilities to the Company and/or its Affiliates, any Confidential Information or any documents which may contain or be derived from Confidential Information, obtained by you in connection with, incident to or as a result of your employment or other association with the Company or any of its Affiliates. You understand that this restriction shall continue to apply after your employment terminates for the longer duration to occur of (i) seventy years or (ii) the protection of Intellectual Property as provided by applicable law, regardless of the reason for such termination. You will not disclose or use any information or documentation obtained from any Person in connection with or as a result of your employment or other association with the Company or any of its Affiliates in a manner that would breach any agreement or obligation owed by you or the Company or any of its Affiliates to that Person. You agree, upon request by the Company, to promptly return all Confidential Information which has been furnished to you and all copies thereof. You further agree that you shall, upon request from the Company, destroy all material, notes and other work product in your possession and/or control related in any way to the Confidential Information.

(b) **Intellectual Property.** To the extent permitted by applicable law, you hereby assign, and agree to assign by way of future assignment, to the Company full right, title and interest in and to all Intellectual Property conceived, made, created, developed or reduced to practice by you (whether alone or with others) during the term of your employment with the Company or within three months thereafter, which is in any way connected to the products or services of the Company or its Affiliates (*"Employee Intellectual Property"*), including those products or services contemplated in a plan under consideration by the Company or its Affiliates, regardless of whether the Intellectual Property was made or acquired (i) during business hours, (ii) at the premises of the Company, (iii) with the assistance of material supplied by the Company, or (iv) at the request of the Company.

In furtherance of the foregoing, you agree that all fruits of your work in connection with the business of the Company or its Affiliates, including all Employee Intellectual Property, shall be wholly-owned by the Company, and the Company shall be entitled to deal therewith as it desires and file the rights related to said Employee Intellectual Property in its name or in the name of its Affiliates. The duty of confidentiality in Section 3a) shall also apply to any such rights related to Employee Intellectual Property.

You shall promptly and fully disclose all Intellectual Property to the Company. Upon request, you will execute any document and instrument required to vest in the Company or its Affiliates complete title and ownership of any Employee Intellectual Property. You

- 3 -

will, at the request of the Company, execute any necessary instrument to obtain legal protection in domestic and foreign countries for Employee Intellectual Property and for the purposes of enforcing rights related to Employee Intellectual Property, all at the Company's expense and without any additional compensation of any kind to you. You irrevocably appoint the Company as your attorney-in-fact in your name and on your behalf to execute all documents and do all things required in order to give full effect to the provisions of this Section.

You will not use, disclose to the Company, or induce the Company to use, any Intellectual Property or documents belonging to any other Person, in breach of any contractual or legal obligation to such Person, during your employment with the Company.

You further warrant that any Intellectual Property created prior to your employment relationship with the Company and/or its Affiliates and for which you claim a right even though such Intellectual Property has not been subject to formal legal protection is disclosed below: None.

(c) **Non-Competition.** You acknowledge that in your employment with the Company you will have access to Confidential Information which, if disclosed, would assist in competition against the Company and its Affiliates and that you will also generate goodwill for the Company and its Affiliates in the course of your employment. Therefore, you agree that the following restrictions on your activities during and after your employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates: You agree that during your employment with the Company and for the period of eighteen (18) months following the date of termination of your employment (together with the period of your employment, the "Non-Competition Period") you will not, directly or indirectly, on your own behalf or on behalf of or in connection with any Person, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, compete with the Company or any of its Affiliates, in North America, Europe, Japan, India, China, South Korea, or anywhere else in the world, where the business of the Company or its Affiliates was being conducted, or where the Company or its Affiliates was planning to conduct the business, during your employment, or undertake any planning for any business competitive with the Company or any of its Affiliates. Specifically, but without limiting the foregoing, you will be considered to be competing with the Company if you engage in any manner in any activity that is directly or indirectly competitive or potentially competitive with the business of the Company or any of its Affiliates as conducted or under consideration at any time during your employment. For the purposes of this Section 3, the business of the Company and its Affiliates shall include all Products and your undertaking shall encompass all items, products and services that may be used in substitution for Products. Without limiting the generality of the foregoing, any business or entity that is involved in the development, distribution and sale of simulation software applications (with "simulation" having the definition given to it within the Dassault Systèmes strategy), solutions or services or of Product Lifecycle Management (PLM) software applications, solutions or services powered by three-dimensional (3D) technology, including without limitation Siemens PLM Software, PTC, Autodesk Inc., MSC Software Corp., The Mathworks, Inc., LMS, Ansys Inc., and their respective successors and assigns, are considered competitors of the

Company. Notwithstanding the foregoing, you shall not be in default under this provision by virtue of your holding, as passive investor only, not more than five per cent (5%) (including both shares held by you and those held by any Person acting jointly or in concert with you) of the issued and outstanding shares of a corporation, in competition with the business of the Company or any of its Affiliates, the shares of which are listed on a recognized stock exchange or an organized securities market; and provided further that you shall not be in default under this provision by virtue of holding, as passive investor only, not more than one per cent (1%) of the issued and outstanding shares of a corporation effecting venture capital investments in businesses in competition with the business of the Company or any of its Affiliates.

(d) **Non-Solicitation.** You agree that during the Non-Competition Period, you will not, directly or through any other Person, (i) hire any employee of the Company or any of its Affiliates or seek to persuade any employee of the Company or any of its Affiliates to discontinue employment, (ii) solicit or encourage any customer of the Company or any of its Affiliates or independent contractor providing services to the Company or any of its Affiliates to terminate or diminish its relationship with them or (iii) seek to persuade any customer or prospective customer of the Company or any of its Affiliates to conduct with anyone else any business or activity that such customer or prospective customer conducts or could conduct with the Company or any of its Affiliates.

(e) In signing this Agreement, you give the Company assurance that you have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on you under this Section 3. You agree without reservation that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. You further agree that, were you to breach any of the covenants contained in this Section 3, the damage to the Company and its Affiliates would be irreparable. You therefore agree that the Company, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by you of any of those covenants, without having to post bond. You and the Company further agree that, in the event that any provision of this Section 3 is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. It is also agreed that each of the Company's Affiliates shall have the right to enforce all of your obligations to that Affiliate under this Agreement, including without limitation pursuant to this Section 3.

4. **Termination of Employment.** Your employment hereunder shall terminate in the following circumstances:

(a) The Company may terminate your employment for Cause upon notice to you setting forth in reasonable detail the nature of the Cause. The following shall constitute Cause for termination: (i) your willful failure to perform, or serious negligence in the performance of, your duties and responsibilities to the Company or any of its Affiliates, which failure or negligence remains uncured or continues or recurs after twenty

- 5 -

(20) days' notice·thereof by the Board; (ii) material breach of any·material provision of this Agreement or the Dassault Systèmes Code of Business Conduct, (iii) the commission of fraud, embezzlement or other dishonesty with respect to the Company or any of its Affiliates; or (iv) commission of a felony or other crime involving moral turpitude.

      (b)    The Company may terminate your employment at·any time other than for Cause upon notice to you. In the event of a sale of.all or substantially all of the assets of the Company, the failure of the buyer to assume this Agreement shall constitute termination by the Company other than·for Cause.

      (c)    You may terminate your employment other than for Good Reason, as defined in Section 4(e) below, upon thirty (30) days' notice to the Company.

      (d)    This Agreement shall automatically terminate in the event of your death during employment. In the event you become disabled during employment through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, are unable to continue to perform substantially all of your duties and responsibilities under this Agreement for one hundred and twenty (120) days during any period of three hundred sixty five (365) consecutive calendar days, the Company may terminate your employment, upon notice to you. If any question shall arise as to whether you are disabled to the extent that you are unable to perform substantially all of your duties and responsibilities for the Company and its Affiliates, you shall, at the Company's request, submit to a medical examination by a physician selected by the Company to whom you or your guardian, if any, has no reasonable objection to determine whether you are so disabled and such determination shall for the purposes of this Agreement be conclusive of the issue. If such a question arises and you fail to submit to the requested medical examination, the Company's determination of the issue shall be binding on you.

      (e)    You may terminate your employment for Good Reason upon notice to the Company setting forth in reasonable detail the nature of the Good Reason, provided that you do so within ninety (90) days of the date you knew or reasonably should have known of the facts giving rise to such Good Reason. The following shall constitute Good Reason for termination if occurring without your consent; provided, however, that neither the terms of this Agreement nor anything that occurred prior to the Effective Date will constitute Good Reason (and you hereby waive any claim to Good Reason you have, had, will have or claim to have based on events that occurred prior to or on the Effective Date of this Agreement):

*EVP and*       (i)    Material diminution in the nature and scope of your duties or responsibilities to the Company or any of its Affiliates with respect to (A) your role as/Strategic Advisor of the Company or (B) your reporting relationship to the Chairman of the Company and the Executive Vice President, Strategy & Marketing of Dassault Systèmes; and

      (ii)    Reduction in the aggregate amount of your Base Salary and target Performance Bonus as in effect on the Effective Date or increased thereafter which

· is not cured within twenty (20) days following notice from you specifying the nature of the reduction.

5.  **Severance Payments and Other Matters Related to Termination.**

(a)     In the event of termination of your employment with the Company, howsoever occurring, the Company shall pay you any Base Salary earned but not paid through the date of termination; pay for any vacation accrued but not used to that date; and reimbursement for any outstanding business expenses you incurred in accordance with Section 2(f) of this Agreement, subject to your submission of those expenses and required substantiation and documentation within thirty (30) days of the date of termination (the "Accrued Obligations"). In the event of termination of your employment by the Company other than for Cause in accordance with Section 4(b) hereof or termination of your employment by you for Good Reason in accordance with Section 4(e) hereof, the Company will: (i) continue to provide you severance payments at the same rate as the Base Salary in effect on the date of termination ("Severance Payments") for the period of twelve (12) months following the date of termination of your employment and (ii) pay you an amount equal to one year's bonus, at the target established for the year in which termination occurs, payable in equal installments at its regular payroll periods during the period in which you are receiving Severance Payments (the "Performance Bonus Payments"). (For the avoidance of doubt, total Performance Bonus Payments shall not in any case exceed one year's bonus at target). Any obligation of the Company to provide you Severance Payments or Performance Bonus Payments under this Section 5(a) is conditioned, however, upon your signing a release of claims in a form acceptable to the Company (the "Employee Release") and such Employee Release becoming effective and irrevocable in accordance with its terms, on or before the 60th day following your termination of employment. Excluded from the scope of the Employee Release, however, will be any rights arising under this Agreement following the effective date of the Employee Release and any rights of indemnification which you may have under the charter or by-laws of the Company. All Severance Payments and Performance Bonus Payments will be payable in accordance with the normal payroll practices of the Company, and will begin at the Company's next regular payroll period which is at least five (5) business days following the later of the effective date of the Employee Release or the date the Employee Release, signed by you, is received by the Company, but the first payment shall be retroactive to the day following the date of termination.

(b)     In the event this Agreement is terminated by reason of your death or disability in accordance with Section 4(d) or by the Company for Cause in accordance with Section 4(a) or you elect to terminate your employment in accordance with Section 4(c) the Company will pay to you (or your designated beneficiary or estate, as the case may be) the Accrued Obligations. The Company shall have no obligation to you for any Performance Bonus Payments or Severance Payments.

(c)     Except for any right you may have under the federal law known as "COBRA" to continue participation in the Company's group health and dental plans at your cost, benefits shall terminate in accordance with the terms of the applicable benefit

plans based on the date of termination of your employment, without regard to any continuation of Base Salary or other payment to you following termination.

(d)     Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including without limitation your obligations under Section 3 of this Agreement. The obligation of the Company to make Severance Payments or Performance Bonus Payments to you under this Agreement after termination of your employment is expressly conditioned upon your continued full performance of obligations under Section 3 hereof. Upon termination by either you or the Company, all rights, duties and obligations of you and the Company to each other shall cease, except as otherwise expressly provided in this Agreement.

(e)     All payments under this Agreement are intended to comply with the applicable regulations issued under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement should be interpreted and applied in a manner consistent with such exemption. If any payment under this Agreement would constitute a deferral of compensation subject to Section 409A of the Code, then to the extent you are a "specified employee" (as determined pursuant to procedures established by the Company) any payment made upon "separation from service" (as such term is defined for purposes of Section 409A) during the six-month period immediately following your termination of employment shall instead be paid or made available on the earlier of (i) the first business day of the seventh month following the date you incur a termination of employment or (ii) your death. For purposes of this Agreement, you will not be considered to have a termination of employment unless the termination of employment qualifies as a "separation from service" within the meaning of Section 409A of the Code. Each payment under this Agreement shall be considered a "separate payment" and not of a series of payments for purposes of Section 409A of the Code.

6.     **Definitions.** For purposes of this Agreement, the following definitions apply:

"Affiliates" means the persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, equity interest or otherwise.

"Confidential Information" means any and all information of the Company or any of its Affiliates, and shall include, without limitation and in whatever form, information concerning the Company's business and strategic plans and opportunities, finances and financial statements, identity of the customers, suppliers and vendors, prices and pricing policies, contract rights and obligations, trade secret, know-how, new products and service ideas and structures, employees and their compensation and benefit plans, policies and procedures, and other information regarding the Company's business and affairs. Confidential Information shall not be limited to information specifically designated as "Confidential" or "Confidential Secured". Confidential Information does not include information that is generally available to the public other than through a breach by me or any other Person of an obligation of confidentiality owed to the Company or any of its Affiliates.

- 8 -

"Intellectual Property" means the following items of intangible and tangible property:

a) Patents, whether in the form of utility patents or design patents and all pending applications for such patents;

b) Trademarks, trade names, service marks, design, logos, and trade dress, whether or not registered, and all pending applications of registration of the same;

c) Copyrights, or copyrightable material, including but not limited to object or source code, documentation, specifications, preparatory works, flow-charts, programmer notes, updates, data, data base, architecture of the code, the software program, articles and publications, whether or not registered or registerable, and all pending applications for registration of the same;

d) Inventions, improvements, research records, discoveries, developments, methods, processes, concepts and ideas, know-how, trade secrets, confidential information, product designs, engineering specifications and drawings, technical information, formulae, customer lists, supplier lists and market analyses;

e) Semiconductor chip designs, whether or not registered as mask works or topographies.

"Person" means any individual, corporation, limited liability company, partnership, association, estate, trust or any other entity or organization, other than the Company or any of its Affiliates.

"Products" mean all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its Affiliates, together with all services provided or planned by the Company or any of its Affiliates, during your employment.

7. **Conflicting Agreements.** You hereby represent and warrant that your signing of this Agreement and the performance of your obligations under it will not breach or be in conflict with any other agreement to which you are a party or are bound and that you are not now subject to any covenants against competition or similar covenants or any court order that could affect the performance of your obligations under this Agreement. You agree that you will not disclose to or use on behalf of the Company any proprietary information of a third party without that party's consent

8. **Withholding.** All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

9. **Assignment.** Neither you nor the Company may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without your consent to one of its Affiliates or to any Person with whom the Company shall hereafter affect a reorganization, consolidate with, or merge into or to whom it transfers all or substantially all of its properties or assets. This Agreement shall inure to the benefit of and be binding upon you and the Company, and each of our respective successors, executors, administrators, heirs and permitted assigns.

10. **Severability.** If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this

Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11. **Miscellaneous.** This Agreement sets forth the entire agreement between you and the Company and replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the terms and conditions of your employment, including without limitation the agreements entered into between you and the Company on or about May 16, 2005 and June 11, 2008. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and the Chairman of the Company. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be an original, and all of which together shall constitute one and the same instrument. This is a Rhode Island contract and shall be governed and construed in accordance with the laws of the State of Rhode Island, without regard to the conflict of laws principles thereof.

12. **Notices.** Any notices provided for in this Agreement shall be in writing and shall be effective when delivered in person or deposited in the United States mail, postage prepaid, and addressed to you at your last known address on the books of the Company or, in the case of the Company, to it at its principal place of business, attention of the Chair of the Board and copy to Dassault Systèmes, at 10 rue Marcel Dassault, 78140 Velizy-Villacoublay, France, attention Senior EVP, Global Development & Resources, or to such other address as either party may specify by notice to the other actually received.

Sincerely yours,

Dassault Systèmes Simulia Corp.

By:
Bernard Charlès, Chairman of the Board of Directors

Accepted and Agreed:

Mark Goldstein

Date: 5/15/2009

cc.    Scott Berkey, Chief Executive Officer, Dassault Systemes Simulia Corp.
       Denise Hempe, Human Resources VP, Dassault Systèmes Simulia Corp.

ABAQUS, Inc.
Rising Sun Mills
166 Valley Street
Providence, RI 02909-2499

T: 401-276-4400
F: 401-276-4408
www.abaqus.com

May 16, 2005

Mr. Mark Goldstein
1 Manning Way
Sharon, MA 02067

Dear Mr. Goldstein:

We are pleased to confirm through this letter our offer to you of employment with Abaqus, Inc. (the "Company" or "Abaqus") effective as of the date of the closing of the transactions contemplated by the Agreement and Plan of Merger dated May 16, 2005 (the "Merger Agreement") by and among Dassault Systèmes Corp., Aqua Acquisition Corp., the Company, the Company Shareholders, Kenneth Short and yourself (the "Effective Date"), under the terms and conditions that follow:

1.     Position and Duties.

(a)     As of the Effective Date, you will be employed by the Company hereunder on a full-time basis as its Chief Executive Officer, reporting to the Chief Executive Officer of Dassault Systèmes and to the Board of Directors of the Company (the "Board"), and you will be a member of the Global Executive Management Team ("GEM"). You will also have oversight responsibility for all Dassault Systèmes' mechanical CAE ("MCAE") business with the exception of COSMOSWorks and with the exception of MCAE services other than those of Abaqus. In addition, you may be asked from time to time to serve as a director or officer of one or more of the Company's Affiliates, without further compensation.

(b)     You agree to perform the duties of your position and such other duties as may reasonably be assigned to you from time to time; provided, however, that you shall not have the authority to take, directly or indirectly, any of the actions set forth on Exhibit A hereto without obtaining the prior written approval of either a majority of the Board of Directors of the Company (the "Board") or the Chief Financial Officer of Dassault Systèmes or the Executive Vice President, Organization and Human Resources of Dassault Systèmes, as specified on Exhibit A. You also agree that, while employed by the Company, you will devote your full business time and your best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and its Affiliates and to the discharge of your duties and responsibilities for them; notwithstanding the foregoing, you may devote a reasonable amount of time to civic and charitable activities, provided such activities do not pose a conflict of interest or interfere with your performance of your duties and responsibilities to the Company and its Affiliates hereunder. As a condition of your employment, you will be required to sign the Dassault Systèmes Code of Business Conduct no later than the Effective Date.

Exhibit B

(c) The parties agree that your employment hereunder shall not be for a definite term, and that either you or the Company may terminate your employment at any time in accordance with Section 4 hereof.

2. Compensation and Benefits. During your employment, as compensation for all services performed by you for the Company and its Affiliates, the Company will provide you the following pay and benefits:

(a) Base Salary. The Company will pay you a base salary at the rate of Three Hundred and Twenty Thousand Dollars ($320,000) per year, payable in accordance with the regular payroll practices of the Company and subject to annual review, with any increase to be in the discretion of Dassault Systèmes. Your base salary, as from time to time increased, is referred to hereafter as the "Base Salary." In no event will the Base Salary be decreased.

(b) Performance Bonus Compensation.

(i) You will receive any bonus compensation that you earn under the Abaqus, Inc. Bonus Plan for 2005 in 2006 at the time provided for payment in the Plan. Bonus compensation earned under that Plan in 2005 shall be in accordance with Plan terms as in effect prior to the Effective Date), except that the amount of any bonus compensation that you earn under the Plan after the Effective Date will be calculated on the basis of the Base Salary and with the applicable target bonus percentage being that set forth in the second sentence of clause (ii) immediately below. (For the avoidance of doubt, no bonus compensation is payable hereunder under the Abaqus Phantom Stock Plan or under any other incentive plan in place prior to the Effective Date.)

(ii) Beginning on January 1, 2006, during your employment, you will be eligible annually for bonus compensation in accordance with the terms set forth by the Company each year for you (the "Performance Bonus"). For the year 2006, your target bonus percentage (the "Target Performance Bonus") will be Fifty Percent (50%) of your Base Salary, as then in effect, and the amount of the bonus payment (if any) will be determined based upon performance related to individual objectives and upon the Company's performance as measured against the defined target financial goals as discussed by you and Dassault Systèmes senior management in connection with the due diligence process. For the avoidance of doubt, and excluding only the long-term incentive plan described immediately below, you will not be eligible to participate in any other incentive or bonus plan or arrangement of the Company or any of its Affiliates during your employment.

(c) Long Term Incentive Compensation. Beginning on January 1, 2006, during your employment, you will be eligible to participate in any long term incentive plan approved by the Company Board and made available to executives of the Company generally, in accordance with the terms thereof, as in effect from time to time ("LTI"). For the 2006-2008 plan, and subject to the Board's approval, your LTI target will be set at One Hundred Percent (100%) of your 2006 Base Salary and Target Performance Bonus. For the year 2006, for the amount of the LTI achievement at target that is based upon the Company's performance, such performance will be measured against the defined target financial goals discussed by you and Dassault Systèmes senior management in connection with the due diligence process.

(d) Participation in Employee Benefit Plans. You will be entitled to participate in all employee benefit plans from time to time in effect for employees of the Company generally, except to the extent such plans are duplicative of benefits otherwise provided you

under this Agreement (e.g., severance pay). Your participation will be subject to the terms of the applicable plan documents and generally applicable Company policies.

(e)     Vacations. You will be entitled to four (4) weeks of vacation per year, in addition to holidays observed by the Company. Vacation may be taken at such times and intervals as you shall determine, subject to the business needs of the Company.

(f)     Business Expenses. The Company will pay or reimburse you for all reasonable business expenses incurred or paid by you in the performance of your duties and responsibilities for the Company, subject to any maximum annual limit and other restrictions on such expenses set by the Company and to such reasonable substantiation and documentation as it may specify from time to time.

3.     Confidentiality and Restricted Activities.

(a)     Confidential Information. You acknowledge that the Company and its Affiliates continually develop Confidential Information (as defined below); that you may develop Confidential Information for the Company or its Affiliates; and that you may learn of Confidential Information during the course of employment. You will comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and shall not disclose to any Person or use, other than as required by applicable law or for the proper performance of your duties and responsibilities to the Company and its Affiliates, any Confidential Information obtained by you incident to your employment or other association with the Company or any of its Affiliates. You understand that this restriction shall continue to apply after your employment terminates, regardless of the reason for such termination. All documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its Affiliates and any copies, in whole or in part, thereof (the "Documents"), whether or not prepared by you, shall be the sole and exclusive property of the Company and its Affiliates. You shall safeguard all Documents and shall surrender to the Company at the time your employment terminates, or at such earlier time or times as the Company or Dassault Systèmes may specify, all Documents then in your possession or control.

(b)     Intellectual Property. You shall promptly and fully disclose all Intellectual Property to the Company. You hereby assign and agree to assign to the Company (or as otherwise directed by the Company) your full right, title and interest in and to all Intellectual Property. You agree to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. You will not charge the Company for time spent in complying with these obligations. All copyrightable works that you create relating to the Products or any prospective activity of the Company or any of its Affiliates or to your work for the Company or any of its Affiliates shall be considered "work made for hire" and shall, upon creation, be owned exclusively by the Company.

(c)     Non-Competition. You acknowledge that in your employment with the Company you will have access to Confidential Information which, if disclosed, would assist in competition against the Company and its Affiliates and that you will also generate goodwill for the Company and its Affiliates in the course of your employment. Therefore,

you agree that the following restrictions on your activities during and after your employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates: You agree that during your employment with the Company and for the period of eighteen (18) months following the date of termination of your employment (together with the period of your employment, the "Non-Competition Period") you will not, directly or indirectly, on your own behalf or on behalf of or in connection with any Person, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, compete with the Company or any of its Affiliates, in North America, Europe, Japan, India, China, South Korea or anywhere else in the world, where the business of the Company or its Affiliates was being conducted, or where the Company or its Affiliates was planning to conduct the business, during your employment, or undertake any planning for any business competitive with the Company or any of its Affiliates. Specifically, but without limiting the foregoing, you agree not to engage in any manner in any activity that is directly or indirectly competitive or potentially competitive with the business of the Company or any of its Affiliates as conducted or under consideration at any time during your employment. In the event that the period for which you are entitled to receive Severance Payments as a result of termination in accordance with Section 4(b) or 4(c) hereof (the "Severance Pay Period"), however, is greater than eighteen (18) months, the Non-Competition Period shall be extended such that it equals such Severance Pay Period. For the purposes of this Section 3, the business of the Company and its Affiliates shall include all Products and your undertaking shall encompass all items, products and services that may be used in substitution for Products. Without limiting the generality of the foregoing, any business or entity that is involved in the development, distribution and sale of simulation software applications (with "simulation" having the definition given to it within the Dassault Systèmes strategy), solutions or services or of Product Lifecycle Management (PLM) software applications, solutions or services powered by three-dimensional (3D) technology, including without limitation UGS, PTC, Autodesk Inc., MSC Software Corp., The Mathworks, Inc., LMS, Fluent Inc., Ansys Inc., and their respective successors and assigns, are considered competitors of the Company. Notwithstanding the foregoing, you shall not be in default under this provision by virtue of your holding, as passive investor only, not more than five per cent (5%) (including both shares held by you and those held by any Person acting jointly or in concert with you) of the issued and outstanding shares of a corporation, in competition with the business of the Company or any of its Affiliates, the shares of which are listed on a recognized stock exchange or an organized securities market; and provided further that you shall not be in default under this provision by virtue of holding, as passive investor only, not more than one per cent (1%) of the issued and outstanding shares of a corporation effecting venture capital investments in businesses in competition with the business of the Company or any of its Affiliates.

(d)     Non-Solicitation. You agree that during the Non-Competition Period, you will not directly or through any other Person, (i) hire any employee of the Company or any of its Affiliates or seek to persuade any employee of the Company or any of its Affiliates to discontinue employment, (ii) solicit or encourage any customer of the Company or any of its Affiliates or independent contractor providing services to the Company or any of its Affiliates to terminate or diminish its relationship with them or (iii) seek to persuade any customer or prospective customer of the Company or any of its Affiliates to conduct with anyone else any business or activity that such customer or prospective customer conducts or could conduct with the Company or any of its Affiliates.

(e)     In signing this Agreement, you give the Company assurance that you have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on you under this Section 3. You agree without reservation that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. You further agree that, were you to breach any of the covenants contained in this Section 3, the damage to the Company and its Affiliates would be irreparable. You therefore agree that the Company, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by you of any of those covenants, without having to post bond. You and the Company further agree that, in the event that any provision of this Section 3 is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. It is also agreed that each of the Company's Affiliates shall have the right to enforce all of your obligations to that Affiliate under this Agreement, including without limitation pursuant to this Section 3.

4.          **Termination of Employment.** Your employment hereunder shall terminate in the following circumstances:

(a)     The Company may terminate your employment for Cause upon notice to you setting forth in reasonable detail the nature of the Cause. The following shall constitute Cause for termination: (i) your willful failure to perform, or serious negligence in the performance of, your duties and responsibilities to the Company or any of its Affiliates, which failure or negligence remains uncured or continues or recurs after twenty (20) days' notice thereof by the Board; (ii) material breach of any material provision of this Agreement or the Dassault Systèmes Code of Business Conduct, (iii) the commission of fraud, embezzlement or other dishonesty with respect to the Company or any of its Affiliates; or (iv) commission of a felony or other crime involving moral turpitude.

(b)     The Company may terminate your employment at any time other than for Cause upon notice to you. In the event of a sale of all or substantially all of the assets of the Company, the failure of the buyer to assume this Agreement shall constitute termination by the Company other than for Cause.

(c)     You may terminate your employment other than for Good Reason, as defined in Section 4(e) below, upon thirty (30) days' notice to the Company.

(d)     This Agreement shall automatically terminate in the event of your death during employment. In the event you become disabled during employment through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, are unable to continue to perform substantially all of your duties and responsibilities under this Agreement for one hundred and twenty (120) days during any period of three hundred sixty five (365) consecutive calendar days, the Company may terminate your employment, upon notice to you. If any question shall arise as to whether you are disabled to the extent that you are unable to perform substantially all of your duties and responsibilities for the Company and its Affiliates, you shall, at the Company's request, submit to a medical examination by a physician selected by the Company to whom you or your guardian, if any, has no reasonable objection to determine whether you are so disabled and such determination shall for the purposes of this Agreement be conclusive of the issue. If such a question arises

$qr$ $Al$ $HJM$

and you fail to submit to the requested medical examination, the Company's determination of the issue shall be binding on you.

(e)    You may terminate your employment for Good Reason upon notice to the Company setting forth in reasonable detail the nature of the Good Reason, provided that you do so within ninety (90) days of the date you knew or reasonably should have known of the facts giving rise to such Good Reason. The following shall constitute Good Reason for termination if occurring without your consent:

(i)    Material change to the following: (A) the fact that any future acquisition made in the field of mechanical CAE will report to you; provided that this provision shall not be construed as s a commitment to do such acquisitions, which shall be decided by the Chief Executive Officer of Dassault Systèmes and its Board of Directors or (B) Abaqus will retain profit and loss responsibility, finance, human resources and information technology within Abaqus; these functions will have dotted line accountability to the corresponding functions within Dassault Systèmes management, and will be subject to applicable Dassault Systèmes policies and procedures;

(ii)    Material diminution in the nature and scope of your duties or responsibilities to the Company or any of its Affiliates with respect to (A) your role as CEO of the Company or (B) your reporting relationship to the Chief Executive Officer of Dassault Systèmes and your participation in the Global Executive Management Team;

(iii)    Reduction in the aggregate amount of your Base Salary and target Performance Bonus as in effect on the Effective Date or increased thereafter which is not cured within twenty (20) days following notice from you specifying the nature of the reduction. (For the avoidance of doubt, any modification to or elimination of the Phantom Stock Plan for Senior Management Employees of Abaqus shall not constitute Good Reason);

(iv)    Material failure to provide employee benefits in accordance with Section 2(d) hereof;

(v)    Change by the Company in the location at which you perform your principal duties for the Company to a new location that is more than thirty-five (35) miles from the location at which you performed your duties for Abaqus immediately prior to the Effective Date or more than thirty-five (35) miles from any subsequent location to which you have consented after the Effective Date; and

(vi)    Material breach by the Company of any material provision of this Agreement which is not cured within twenty (20) days following notice from you specifying the nature of such breach;

provided, however, that the foregoing shall constitute Good Reason during the first three years of your employment hereunder and thereafter only clauses (ii) and (iii) shall constitute Good Reason.

5.    Severance Payments and Other Matters Related to Termination.

(a)    In the event of termination of your employment with the Company, howsoever occurring, the Company shall pay you any Base Salary earned but not paid through the date of termination; pay for any vacation accrued but not used to that date; and reimbursement for

any outstanding business expenses you incurred in accordance with Section 2(f) hereof, subject to your submission of those expenses and required substantiation and documentation within thirty (30) days of the date of termination (the "Accrued Obligations"). In the event of termination of your employment by the Company other than for Cause in accordance with Section 4(b) hereof or termination of your employment by you for Good Reason in accordance with Section 4(e) hereof, in either case during the first three years of your employment hereunder, the Company will: (i) continue to provide you severance payments at the same rate as the Base Salary in effect on the date of termination ("Severance Payments") for the period of the greater of either (A) eighteen months or (B) the number of months that represents the difference between thirty six (36) months and the number of months you were employed hereunder, but in no event more than twenty four (24) months and (ii) pay you an amount equal to one year's bonus, at the target established for the year in which termination occurs, payable in equal installments at its regular payroll periods during the period in which you are receiving Severance Payments (the "Performance Bonus Payments"). In the event of termination of your employment by the Company other than for Cause in accordance with Section 4(b) hereof or termination of your employment by you for Good Reason in accordance with Section 4(e) hereof, in either case after the first three years of your employment hereunder, the Company will: (y) make Severance Payments to you for twelve (12) months following the date of termination of your employment and (z) make Performance Bonus Payments to you during the period you are receiving such Severance Payments. (For the avoidance of doubt, total Performance Bonus Payments, whether provided under the second or third sentence of this Section 5(a), shall not in any case exceed one year's bonus at target.) Any obligation of the Company to provide you Severance Payments or Performance Bonus Payments under this Section 5(a) is conditioned, however, upon your signing a release of claims in a form acceptable to the Company (the "Employee Release") within twenty-one (21) days of the date on which you receive notice of termination of your employment, or such longer period as the Company may designate, and upon your not revoking the Employee Release thereafter. Excluded from the scope of the Employee Release, however, will be any rights arising under this Agreement following the effective date of the Employee Release and any rights of indemnification which you may have under the charter or by-laws of the Company. All Severance Payments and Performance Bonus Payments will be payable in accordance with the normal payroll practices of the Company, and will begin at the Company's next regular payroll period which is at least five (5) business days following the later of the effective date of the Employee Release or the date the Employee Release, signed by you, is received by the Company, but the first payment shall be retroactive to the day following the date of termination.

(b)    In the event this Agreement is terminated by reason of your death or disability in accordance with Section 4(d) hereof or by the Company for Cause in accordance with Section 4(a) or you elect to terminate your employment in accordance with Section 4(c) hereof, the Company will pay to you (or your designated beneficiary or estate, as the case may be) the Accrued Obligations. The Company shall have no obligation to you for any Performance Bonus Payments or Severance Payments.

(c)    Except for any right you may have under the federal law known as "COBRA" to continue participation in the Company's group health and dental plans at your cost, benefits shall terminate in accordance with the terms of the applicable benefit plans based on the date of termination of employment, without regard to any continuation of Base Salary or other payment to you following termination.

(d)     Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including without limitation your obligations under Section 3 of this Agreement. The obligation of the Company to make Severance Payments or Performance Bonus Payments to you under this Agreement after termination of your employment is expressly conditioned upon your continued full performance of obligations under Section 3 hereof. Upon termination by either you or the Company, all rights, duties and obligations of you and the Company to each other shall cease, except as otherwise expressly provided in this Agreement.

6.          Definitions.  For purposes of this Agreement, the following definitions apply:

"Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, equity interest or otherwise.

"Confidential Information" means any and all information of the Company and its Affiliates that is not generally available to the public. Confidential Information also includes any information received by the Company or any of its Affiliates from any Person with any understanding, express or implied, that it will not be disclosed. Confidential Information does not include information that enters the public domain, other than through a breach by you or any other Person of an obligation of confidentiality owed to the Company or any of its Affiliates.

"Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by you (whether alone or with others, whether or not during normal business hours, on or off Company premises) during your employment or within three months thereafter that relate to either the Products or any prospective activity of the Company or any of its Affiliates or that make use of Confidential Information or any of the equipment or facilities of the Company or any of its Affiliates.

"Mechanical Computer-Aided Engineering (MCAE)" means any solving, pre-processing, post-processing and optimization dependent on the Finite Element Method, computational fluid dynamics, and/or mechanism simulation.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust or any other entity or organization, other than the Company or any of its Affiliates.

"Products" mean all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its Affiliates, together with all services provided or planned by the Company or any of its Affiliates, during your employment.

7.          Conflicting Agreements.  You hereby represent and warrant that your signing of this Agreement and the performance of your obligations under it will not breach or be in conflict with any other agreement to which you are a party or are bound and that you are not now subject to any covenants against competition or similar covenants or any court order that could affect the performance of your obligations under this Agreement.  You agree that you will not disclose to or

Page 8 of 12

use on behalf of the Company any proprietary information of a third party without that party's consent

8.  **Withholding.** All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

9.  **Assignment.** Neither you nor the Company may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without your consent to one of its Affiliates or to any Person with whom the Company shall hereafter affect a reorganization, consolidate with, or merge into or to whom it transfers all or substantially all of its properties or assets. This Agreement shall inure to the benefit of and be binding upon you and the Company, and each of our respective successors, executors, administrators, heirs and permitted assigns.

10. **Severability.** If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11. **Miscellaneous.** This Agreement sets forth the entire agreement between you and the Company and replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the terms and conditions of your employment, including without limitation the Abaqus Phantom Stock Plan (which, for the avoidance of doubt, terminates your obligations thereunder with respect to confidentiality and non-competition from and after the Effective Date) and excluding only the release of claims which you signed in connection with payment to you under the Abaqus Phantom Stock Plan, which release of claims shall remain in full force and effect. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Board. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. This is a Rhode Island contract and shall be governed and construed in accordance with the laws of the State of Rhode Island, without regard to the conflict of laws principles thereof.

12. **Notices.** Any notices provided for in this Agreement shall be in writing and shall be effective when delivered in person or deposited in the United States mail, postage prepaid, and addressed to you at your last known address on the books of the Company or, in the case of the Company, to it at its principal place of business, attention of the Chair of the Board and copy to Dassault Systèmes, at 9 Quai Marcel Dassault, 92150 Suresnes, France, attention EVP Organization & Human Resources, or to such other address as either party may specify by notice to the other actually received.

13.     **Condition Precedent.** In the event that the closing of the transactions described in the opening paragraph of this Agreement does not occur on or before the Closing Date as defined in Section 1.2 of the Merger Agreement, this Agreement shall be void and of no force or effect.

If the foregoing is acceptable to you, please sign this letter in the space provided and return it to Dassault Systèmes, 9 Quai Marcel Dassault, 92150 Suresnes (France), Muriel Penicaud, EVP Organization & Human Resources, no later than May 16, 2005. At the time you sign and return it this letter will take effect as a binding agreement between you and the Company on the basis set forth above. The enclosed copy is for your records.

Sincerely yours,

ABAQUS, INC.

By: _____

David Hibbitt, Chairman of the Board.

DASSAULT SYSTEMES

By: _____

Muriel Penicaud, EVP Organization & Human Resources

Accepted and Agreed:

_____

Mark Goldstein

Date: Nov. 16, 2005

## Exhibit A

1) The following actions must be approved in advance, in writing, by a majority of the Board:

    (i)    any loan or series of loans to the Company in an amount equal to or greater than $150,000;

    (ii)    any loan or series of loans with a duration of more than six (6) months;

    (iii)    any modification to the capital of the Company, including but not limited to the

          issuance of Common Stock or any other type of equity in the Company;

    (iv)    any merger, consolidation or other restructuring of the Company;

    (v)    the sale of any assets of the Company which has not been included in budget forecast approved by the Board;

    (vi)    any acquisition of assets which has not been included in budget forecast approved by the Board;

    (vii)    any engagement or termination of a working contract, or employment agreement or other such similar contract of a member of the Executive team;

    (viii)    any acquisition, whether direct or indirect, of any capital stock of the Company or any capital stock or equity in any other company, corporation, joint venture, partnership, limited partnership, limited liability company or other such corporate entity, which has not been included in budget forecast approved by the Board;

    (ix)    any sale, whether direct or indirect, of any capital stock of the Company or any capital stock or equity in any other company, corporation, joint venture, partnership, limited partnership, limited liability company or other such corporate entity, which has not been included in budget forecast approved by the Board.

2) The following actions must be approved in advance, in writing, by the Chief Financial Officer of Dassault Systèmes:

    (i)    Any appointment of a depositary of the Company and any opening of bank accounts;

    (ii)    Any exchange and interest rates hedging;

    (iii)    Any lease agreement;

    (iv)    Any power of attorney executed with banking or financial institutions, or with any other business intermediaries;

    (v)    Any change in the list of the signatories of the bank accounts;

    (vi)    Any agreement with IBM or IBM Business Partners;

    (vii)    Any type of agreement or transaction between the Company and any company, entity, individual, directly or indirectly related or affiliated to the CEO or any member of his family.

3) The following actions must be approved in advance, in writing, by the Executive Vice President, Organization & Human Resources of Dassault Systèmes:

    (i)    any engagement or termination of a working contract, or employment agreement or other such similar contract of any key person or employee (list to be annually defined) whose base salary is more than $150,000).